[Civ. No. 3355. Third Appellate District.—December 15, 1927.]

HENRY W. ECKEL, Plaintiff and Appellant, v. SPRINGFIELD TUNNEL AND DEVELOPMENT COMPANY (a Corporation), Defendant and Appellant.

Edwin L. Forster, Robert R. Moody and J. B. Curtin for Plaintiff and Appellant.

J. C. Webster and Grant & Zimdars for Defendant and Appellant.

FINCH, P. J.—The plaintiff brought this action to enjoin the interference by defendant with the natural flow

of water from a certain spring and for damages caused by past interference therewith. The facts hereinafter stated appear from the findings.

The plaintiff is the owner of 87½ acres of land, through which Mormon Creek flows, all of such lands being riparian to the stream. The defendant is the owner of a tract of land adjoining plaintiff's land on the north and containing approximately 1,000 acres. Patents were issued by the United States more than fifty years ago for all of said lands of both parties. Mormon Creek is a small stream and ''in dry seasons there is little or no water in this creek as it passes through'' plaintiff's land. About ''one quarter of a mile above plaintiff's lands and on the bank of said creek is a spring of water . . . known as Fales Spring, which spring is an opening in the crevice in limestone formation and has a normal flow of water of twenty-four inches which waters for more than fifty years prior to the commencement of this action, have been conveyed by means of a pipe, flume and ditches to plaintiff's said lands and there used for irrigation, domestic, and household purposes. . . . For more than eight years last past the defendant has been continuously engaged in operating upon said lands for the purpose of discovering and extracting therefrom the gold contained therein, and never acquired said land for any other purpose and has never used said lands for any other purpose and has never sunk any shafts or run any tunnels or drifts therein for or with any other purpose, object or design, other than to take and remove from said lands the gold contained therein, estimated to be in large and paying quantities.'' A large part of defendant's land lies at an elevation of about 180 feet above the surface of plaintiff's land and ''upon a plateau or table mountain at the base of a slope. Easterly and somewhat northeasterly from this tract there are higher altitudes. Immediately east and northeast is a flat area of limestone formation. Further east it is mountainous. Across defendant's land, running northerly and southerly and almost at right angles to Mormon Creek, is a reef of rock slate varying in width from one hundred to six hundred feet. The depth of this reef of slate is not known further than that it extends below the strata of gold-bearing gravel underlying defendant's land, where its under-

ground mining operations are carried on. . . . On the east side of the slate the soil, composed largely of limestone and gravel, is saturated with water to such an extent that the water constantly seeps into defendant's underground workings and shafts.'' These shafts range in depth from 242 feet to 265 feet. The defendant undertook, without success, to drain the mine by means of large pumps. During the operation of the pumps the flow of water in Mormon Creek and from the spring was greatly diminished. Thereafter the defendant ''began the construction of a drain tunnel . . . about one mile west of the mine within the lower boundaries of the defendant's land at an elevation lower than the bottom of its mining shafts, and where the water when discharged through the same would flow into Mormon Creek at a point below the lands of the plaintiff. Defendant expended on the construction of this tunnel over a half million dollars, and was engaged in the work of construction for more than five years.'' When completed ''the tunnel drew the percolating water from the saturated soil east of the slate reef. Within a few hours after the water began flowing through the tunnel, the spring on plaintiff's land and Mormon Creek where it passes through his lands ceased to flow. . . . Great quantities of water in rain and snow fall upon the hills and mountains east of this property. Much of this sinks into the ground and works its way westward in its general course toward the sea through the porous soil and gravel and through crevices and interstices until it reaches the slate reef. This being impervious to water, the further flow westward is obstructed, and the water level of this underground water is raised in such soil as is pervious to water until it finds some means of outlet along the hillside and elsewhere. Thus, through some unknown seam or crevice in the rocks, some of the water when at a high level on defendant's land finds its way to plaintiff's spring and to Mormon Creek. . . . Most of this water percolates through rock and gravel that has filled an old surface stream. The bed of this stream, if such it can be called, is some two hundred and fifty feet below the surface of defendant's land at its highest point and about sixty feet lower than the surface of plaintiff's lands. Plaintiff's lands are not riparian to this underground channel. . . . The

water now saturating the soil where the old channel seems once to have been is diffused in many directions. . . . Much more water is now passing through the tunnel than heretofore rose to the surface in the vicinity of plaintiff's property. . . . Of the water underlying defendant's land, much of it has hitherto escaped from the soil lying east of the reef of slate in other ways than by rising on lands of plaintiff into Mormon Creek and into the springs. . . . The water saturating the soil east of the slate reef on defendant's land and now being drawn through the tunnel and a part of which heretofore found its way into plaintiff's spring and into Mormon Creek . . . is percolating water. . . . The lands of plaintiff are not underlaid with the same character of soil that underlies the lands of defendant. There is no general connected stratum of soil underlying the lands of plaintiff and defendant, through which the same waters are percolating, and in which the plaintiff and defendant would have common and correlative rights and the waters some distance below the surface of plaintiff's lands are not so connected with the water in defendant's land as that the draining of defendant's land through the tunnel will lower the water to the level in plaintiff's land to which it is lowered in defendant's land." The defendant paid $145,605 as the purchase price of its lands and has expended thereon an additional sum of more than $730,000. It cannot "carry on its mining operations or remove any gold therefrom unless it be permitted to continue to keep said waters drained from all of its said lands by means of said tunnel, . . . and defendant never at any time from the time it was incorporated to the present date offered for sale or distribution to any person any of the waters it has encountered, . . . and the method of operating its mines by means of draining the same with said tunnel is a reasonable and proper means of mining on said lands. . . . Plaintiff has suffered damages by reason of the drying of the said Fales Spring" and, for want of water therefrom, during the years 1921 and 1922, his fruit crop and his alfalfa did not mature.

Judgment was entered in favor of the defendant, denying plaintiff the relief prayed for in the complaint, but providing that if the defendant shall at any time "for a period of ninety days discontinue or cease mining opera-

tions on its said land," it shall, "at its own expense and cost, place in said tunnel . . . a concrete bulkhead which will permanently prevent any water from passing beyond said bulkhead," and further requiring the defendant to give a bond in the penal sum of $1,000, "conditioned for the erection of said bulkhead within ninety days after the discontinuance of mining of its said lands." The plaintiff has appealed from the judgment and the defendant has appealed from the part thereof containing the aforesaid provisions and conditions. Both appeals are on the judgment-roll alone. From a stipulation filed herein, signed by the attorneys for the respective parties in this and two other actions against the defendant, E. G. Fisher, as guardian, being the plaintiff in one and Lillian Engler in the other, it appears that the three actions "were tried in superior court at the same time and upon the same testimony"; that the plaintiffs and the defendant "in each and all of said actions" have appealed; and that the decision on appeal "as entered in the one case . . . shall be considered as given, made and decided in each of the other two cases." In the defendant's opening brief it is said: "Similar averments of the ownership of certain lands and of the existence of springs thereon and the ownership and use of the waters thereof are alleged in the complaints in each of the other two actions against this defendant."

It clearly appears from the findings that the waters underlying defendant's lands are percolating waters, not, as the defendant seems to contend, mere "vagrant, wandering drops moving by gravity in any and every direction along the line of least resistance," but "a vast mass of water confined in a basin filled with detritus, always slowly moving downward to the outlet" or outlets. (*Los Angeles* v. *Hunter*, 156 Cal. 603, 607 [105 Pac. 755].)

The court found that these percolating waters naturally supply the plaintiff's spring and Mormon Creek, that his land is riparian to Mormon Creek, and that the spring in question is "on the bank of said creek." It follows that the natural flow of the water from the spring is down and through the creek and that the plaintiff's rights therein are those of a riparian owner. The fact that he diverts the water from the spring and conveys it to his land through "a pipe, flume and ditches" instead of letting

it flow naturally through the channel of the creek does not destroy its character as riparian water or his rights therein as a riparian owner. (*Turner* v. *The James Canal Co.*, 155 Cal. 82, 92 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520]; *Miller & Lux* v. *Enterprise C. etc. Co.*, 169 Cal. 415, 436 [147 Pac. 567]; *Holmes* v. *Nay*, 186 Cal. 231, 240 [199 Pac. 325].) █ The following language of the court in *Hudson* v. *Dailey*, 156 Cal. 617, 628 [105 Pac. 748], is applicable to the facts found by the trial court in this case:

"Undoubtedly the water in the lands of many of the defendants would be of the class ordinarily designated as percolating water. It is therefore important to determine the relative rights of the owner of the non-riparian land containing percolating water, which feeds a surface stream, and those who have acquired riparian or prescriptive rights in said stream, where the pumping of such percolating water and its use on the land in which it is found will diminish the surface stream, to the injury of those having such riparian or prescriptive rights therein.

"The owner of land has a natural right to the reasonable use of the waters percolating therein, although it may be moving through his land into the land of his neighbor, and, although his use may prevent it from entering his neighbor's land or draw it therefrom. This right arises from the fact that the water is then in his land so that he may take it without trespassing upon his neighbor. His ownership of the land carries with it all the natural advantages of its situation, and the right to a reasonable use of the land and everything it contains, limited only by the operation of the maxim *sic utere tuo ut alienum non laedas*. It is upon this principle that the law of riparian rights is founded, giving to each owner the right to use the waters of the stream upon his riparian land, but limiting him to a reasonable share thereof, as against other riparian owners thereon. We think the same application of the principle should be made to the case of percolating waters feeding the stream and necessary to its continued flow. There is no rational ground for any distinction between such percolating waters and the waters in the gravels immediately beneath and directly supporting the surface flow, and no reason for applying a different rule to the two classes, with respect to such

rights, if, indeed, the two classes can be distinguished at all. Such waters, together with the surface stream supplied by them, should be considered a common supply, in which all who by their natural situation have access to it have a common right, and of which they may each make a reasonable use upon the land so situated, taking it either from the surface flow, or directly from the percolations beneath their lands. The natural rights of these defendants and the plaintiff in this common supply of water would therefore be coequal, except as to quantity, and correlative.'' See, also, *San Bernardino* v. *Riverside,* 186 Cal. 7, 14 [198 Pac. 784]; *Los Angeles* v. *Hunter,* 156 Cal. 603, 608 [105 Pac. 755]; *McClintock* v. *Hudson,* 141 Cal. 275, 281 [74 Pac. 849].

It is clear from the foregoing quotation, as well as from other authorities, that in this state the term ''reasonable use,'' as employed therein, does not mean that one of two or more persons having correlative rights in a common supply of water may take all that is reasonably beneficial to his land, regardless of the needs of the others, as the defendant contends, but only his reasonable share thereof, if there is not enough to supply the needs of all. ''Necessity is not the sole measure of right in such cases.'' (*Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655, 667 [93 Pac. 1021].) ''There is a distinction between the English rule as modified by·the modern American rule of reasonable use and the rule of correlative rights. Under the rule of reasonable use some of the authorities hold that a land owner has a right to make such a beneficial use of the water found percolating through his land to the extent that may be necessary for the improvement of his land, so long as it is used thereon, although in so doing he may drain the lands of his neighbors. Upon the other hand, the rule of correlative rights to these owners is the rule which abrogates the English rule as to these waters and holds that the rights of all land owners over a common basin, saturated strata, or underground reservoir, are coequal or correlative, and that one land owner cannot extract more than his share of the water even for use on his own lands, where the rights of others are injured thereby.'' (Kinney on Irrigation and Water Rights, 2d ed., sec. 1192.) ''It is a question of reasonable use, and that applies both to the land of the

person disturbing the percolation and to adjoining land." (*Katz* v. *Walkinshaw*, 141 Cal. 116, 143 [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663].)

█ It may be that the defendant would derive a greater benefit from the drainage of its mine than the plaintiff receives from the use of the water flowing from the spring, but that fact is wholly immaterial. The value of a flow of twenty-four inches of water is in no sense unsubstantial or negligible, and it is elementary that private property cannot be taken for private use upon the ground that it is more valuable to the taker than to him from whom it is taken. (*Scott* v. *Fruit Growers' Supply Co.*, 202 Cal. 47 [258 Pac. 1095].) █ Since both parties have correlative rights in the waters in question, however, the situation may be such as, under appropriate issues, to warrant a conditional injunction only, restraining the defendant from diverting the flow of water from plaintiff's spring except during such times as it shall restore to the plaintiff's land an equal quantity of water of like quality as that which naturally flows from the spring, or such part thereof as constitutes the plaintiff's reasonable share of the common supply. (*Gould* v. *Eaton*, 117 Cal. 539, 543 [38 L. R. A. 181, 49 Pac. 577]; *Montecito Valley Co.* v. *Santa Barbara*, 144 Cal. 578, 602 [77 Pac. 1113]; *Newport* v. *Temescal Water Co.*, 149 Cal. 531, 539 [6 L. R. A. (N. S.) 1098, 87 Pac. 372]; *Huffner* v. *Sawday*, 153 Cal. 86, 94 [94 Pac. 424].) █ The facts found by the court show that the plaintiff is also entitled to damages caused by the defendant's wrongful diversion of the water from his spring. It is clear that the plaintiff is not estopped to maintain the action. (*Verdugo Cañon Water Co.* v. *Verdugo*, 152 Cal. 655, 684 [93 Pac. 1021].)

The judgment is reversed, the plaintiff to recover his costs of appeal.

Plummer, J., and Hart, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 9, 1928.

Preston, J., dissented.