[Civ. No. 7292. Second Appellate District, Division Two.—November 29, 1930.]

BANDINI PETROLEUM COMPANY (a Corporation) et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

Call & Murphey, Robert B. Murphey, Asa V. Call, and Wm. L. Murphey for Petitioners.

U. S. Webb, Attorney-General, and James S. Bennett for Respondents.

Arthur R. Smiley, Roland Rich Woolley, Rush M. Blodget, George W. Nilsson, Robt. M. Pease and Roy P. Dolley, *Amici Curiae.*

THOMPSON (IRA F.), J.—This is an original prohibition proceeding. The petitioners seek to prevent the respondent court from enforcing a preliminary injunction and order modifying the same and also to check any further order or proceeding against them in an action pending in the respondent court entitled *People of the State of California on Relation of Fred G. Stevenot, Director of Natural*

*Resources of the State of California* v. *Associated Oil Company et al.,* which action was brought for the purpose of enjoining all of the defendants therein named from unreasonably wasting natural gas from their wells in the Santa Fe Springs oil-field. On March 19, 1930, after hearing the parties to the action, the court granted a temporary injunction limiting and defining the amount of gas which the defendants would be allowed to permit to escape into the air from their wells in the field mentioned. On March 28, 1930, the court made another order somewhat relaxing the terms of the injunction *pendente lite.* It is asserted by petitioners that they have been irreparably injured and damaged by attempting to curtail the production of natural gas; that there is no market for a large part thereof and that if they are to be allowed as they claim it is their right, to employ the gas as a lifting power to raise the oil from below the surface they must of necessity permit a portion thereof to escape into the air; that prior to the temporary injunction they were producing 19,554 barrels of oil per day but that operating most efficiently under the amount of gas allowed to be used by the modified order they cannot possibly produce more than 10,211 barrels per day.

The action was instituted in the respondent court pursuant to the provisions of "An act to protect the natural resources of petroleum and gas from waste and destruction, etc." (Stats. 1929, p. 923), the sections of which pertinent at this point in our discussion read as follows: "Sec. 8b. The unreasonable waste of natural gas by the act, omission, sufferance or insistence of the lessor, lessee or operator of any land containing oil or gas, or both, whether before or after the removal of gasoline from such natural gas, is hereby declared to be opposed to the public interest and is hereby prohibited and declared to be unlawful. The blowing, release or escape of natural gas into the air shall be *prima facie* evidence of unreasonable waste. (Sec. 14b.) Whenever it appears to the director of the department of natural resources that the owners, lessors, lessees or operators of any well or wells producing oil and gas or oil or gas are causing or permitting an unreasonable waste of gas, he may institute, or have proceedings instituted, in the name of the people of the State of California, to enjoin such unreasonable waste of gas regardless of whether proceedings

have or have not been instituted under section 8'' (a section authorizing the oil and gas supervisor to issue certain orders) ''hereof, and regardless of whether an order has or has not been made therein. Such proceedings shall be instituted in the superior court for the county in which the well or wells from which the unreasonable waste of gas is occurring or any thereof are instituted. The owners, lessors, lessees or operators causing or permitting an unreasonable waste of gas in the same oil or gas field, although their properties and interests may be separately owned and their unreasonable waste separate and distinct, may be made parties to said action. In such suits no restraining order shall be issued *ex parte,* but otherwise the procedure shall be governed by the provisions of chapter three, title seven, part two of the Code of Civil Procedure of the State of California'' (a chapter relating to injunctions) ''and no temporary or permanent injunction issued in such proceedings shall be refused or dissolved or stayed pending appeal upon the giving of any bond or undertaking, or otherwise.''

The arguments of the petitioners may be grouped into the following propositions: First: The act deprives petitioners of property without just compensation and without due process of law. Second: The statute is void for uncertainty and for failure of the legislature to define a standard of conduct. Third: The enactment permits the use of gas for lifting purposes in a reasonable proportion to the amount of oil produced and that the uncontroverted evidence shows no other or greater use and for that reason the court was without jurisdiction to grant the temporary injunction.

■ Turning then to the first contention, it is asserted that the act is violative of the Fourteenth Amendment to the federal Constitution and sections 13 and 14 of article I of the state Constitution. To put the argument· most favorably for the petitioners it is asserted that they have the same vested right to make use of the gas under their property for the purpose of lifting the oil thereunder that a riparian owner has to make use of the underflow of a stream passing through his property to lift the waters to levels of entry upon his land. It is therefore insisted by counsel that it is of prime importance to examine the nature of petitioners' rights. While this is true in a degree, yet we do not attach the same weight as do petitioners to the

pure legal question whether the owner of the surface is the owner of the gas in place under his soil subject to the right of an adjoining owner to appropriate to himself the title thereto by capture and possession, or whether the owner of the surface is vested only with the right to bore for gas and reduce it to possession. In either event he is the owner of a valuable right. Every owner of the surface has a like interest and right of property, whatever it may be.

We think, however, that the better reasoning, on account of the self-propelling or migratory character of natural gas, as well as oil, dictates the conclusion that while in general we may speak of the owner of the surface as being the owner of the gas and oil in place, what we really mean is that he and he alone has the right through his own property to endeavor to reduce the substances to possession; that when they are reduced to possession and then only does he have an absolute and unqualified title thereto. It is argued by petitioners and by some of those who have appeared as *amici curiae* that the law of California is settled to the effect that the owner of the surface is the owner of the gas and oil *in situ*. There are some general expressions in the authorities to this effect, particularly in tax cases where assessments have been levied upon a lease giving and granting to the lessee the right to bore for and extract the hydro-carbon substances. But they are not controlling or helpful here. On the other hand, in distinguishing between oil and other minerals in the case of *Acme Oil Co.* v. *Williams*, 140 Cal. 681 [74 Pac. 296], the Supreme Court said: "Oil, on the contrary, is of a fluctuating, uncertain, fugitive nature, lies at unknown depths, and the quantity, extent, and trend of its flow are uncertain. It requires but a small surface area, in what is known as an oil district, upon which to commence operations for its discovery. But when a well is developed the oil may be tributary to it for a long distance through the strata which holds it. This flow is not inexhaustible, no certain control over it can be exercised, and its actual possession can only be obtained, *as against others in the same field*, engaged in the same enterprise, by diligent and continuous pumping. *It is the property of anybody who can acquire the surface right to bore for it*, and when the flow is penetrated, he who operates his well most diligently obtains the greatest

benefit, and this advantage is increased in proportion as his neighbor similarly neglects his opportunity." (Italics ours.) ■■ It is the coexistence of these rights which authorizes the state to make use of its legislative power. When the rights of one impinge upon the rights of others the state may interpose for the purpose of adjusting and regulating the enjoyment of those rights. This is, in a large part at least, the foundation of all the authorities which support the power of the state to regulate the production of oil and gas. In *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576, 581], it is said: "No one owner of the surface of the earth, within the area beneath which the gas and oil move can exercise his right to extract from the common reservoir, in which the supply is held, without to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners," and " . . . (T)he surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. *But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate.* It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, *or by waste by one or more to the annihilation of the rights of the remainder.* Hence it is that the legislative power, from the peculiar nature of the right and objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste." (Italics ours.) In *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 [Ann. Cas. 1912C, 160, 55 L. Ed. 369, 31 Sup. Ct. Rep. 337, 339], where the court was considering a stat-

ute designed to prevent the waste of natural mineral water by pumping for the purpose of extracting the gas therefrom, after reference to and a discussion of the Ohio Oil Company case just mentioned, it is said: ''The mineral waters and carbonic acid gas exist in a commingled state in the underlying rock, and neither can be drawn out without the other. They are of value in their commingled form and also when separated, but the greater demand is for the gas alone. Influenced by this demand, some surface owners, having wells bored or drilled into the rock, engage in extensive pumping operations for the purpose of collecting the gas and vending it as a separate commodity. Usually where this is done an undue proportion of the commingled waters and gas is taken from the common supply, and a large, if not the larger, portion of the waters from which the gas is collected is permitted to run to waste. Thus these pumping operations generally result in an unreasonable and wasteful depletion of the common supply and in a corresponding injury to others equally entitled to resort to it. It is to correct this evil that the statute was adopted, and the remedy which it applies is an enforced discontinuance of the excessive and wasteful features of the pumping. It does not take from any surface owner the right to tap the underlying rock and to draw from the common supply, but, consistently with the continued existence of that right, so regulates its exercise as reasonably to conserve the interests of all who possess it. That the state, consistently with due process of law, may do this, is a necessary conclusion from the decision in the case cited. But were the question an open one, we still should solve it in the same way.'' We ought to pause long enough to direct attention to this last sentence on account of its bearing upon the argument presented here that the rule established by *Ohio Oil Co.* v. *Indiana, supra,* has become obsolete.

In *Commonwealth* v. *Trent,* 117 Ky. 34 [4 Ann. Cas. 209, 77 S. W. 390, 392], the court places the source of the regulatory power upon both grounds in the following language: ''It is well known that the supply of gas is limited, and may be exhausted. The act is intended to protect the supply from waste. Under the act, it is conceded, a person to exhaust the supply of his neighbor, cannot put down

wells on his own land and allow the gas to escape from the well. . . . The legislature may protect from waste the natural resources of the state, which are the common heritage of all. The right of the owner of property to do with it as he pleases is subject to the limitation that he must have due regard for the rights of others. To allow the storehouse of nature to be exhausted by the waste of the gas would be to deprive the state and its citizens of the many advantages incident to its use. That the legislature may prevent this is well settled." (Citing cases.) In Oklahoma the statute not only prevented the escape of gas into the air, "the intentional drowning with water of a gas stratum", the "underground waste" of gas, but also the "wasteful utilization of such gas". The Supreme Court of that state in the case of *Quinton Relief Oil & Gas Co.* v. *Corporation Com.*, 101 Okl. 164 [224 Pac. 156], after referring to *Walls* v. *Midland Carbon Co.*, 254 U. S. 300 [65 L. Ed. 276, 41 Sup. Ct. Rep. 118], where a somewhat similar statute of Wyoming was under scrutiny, said: "A careful examination of the authorities show that there is almost unanimity in holding that the burning of natural gas for carbon purposes in high pressure fields, having sufficient rock pressure to force gas through a pipe line to domestic consumers, and where the same may be used for such purpose, constitutes a wasteful utilization thereof. Natural gas has twice the heating units as (*sic*) artificial gas, and taking into consideration the convenience of natural gas, it is intrinsically worth more than artificial gas; its market value being from $2.00 to $3.00 per thousand cubic feet. The amount of carbon black produced from 1000 cubic feet of natural gas has a market value of about 10 cents. It therefore is obvious that the state, in the proper exercise of its police power and in conservation of so valuable a natural resource as natural gas, may prohibit the wasteful utilization of the same in the interest of the public welfare." In *State* v. *Carson Carbon Co.*, 162 La. 781 [111 South. 162], the Supreme Court of Louisiana sustained an enactment by which the owners of gas wells were prohibited from taking and using for the manufacture of carbon black more than twenty per cent of the potential capacity of a gas-well. In *Oxford Oil Co.* v. *Atlantic Oil & Producing Co.*, 22 Fed. (2d) 597, the court says: "The right of a state

to so regulate the drilling of wells for oil and gas as to conserve the rights of adjoining owners is too well settled to admit of serious controversy. (*Ohio Oil Co.* v. *Indiana,* 177 U. S. 190 [44 L. Ed. 720, 20 Sup. Ct. Rep. 576]; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 [Ann. Cas. 1912C, 160, 55 L. Ed. 369, 31 Sup. Ct. Rep. 337].) It was within the power of the legislature to lay down a general rule for the protection of the mineral rights of the owners of adjoining lands, and to leave the details of ènforcing that rule to an administrative agency or board. (*Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531 [58 L. Ed. 713, 34 Sup. Ct. Rep. 359].)'' By a divided court in the case of *Walls* v. *Midland Carbon Co.,* 254 U. S. 300 [65 L. Ed. 276, 41 Sup. Ct. Rep. 118], a statute of Wyoming declaring the use of natural gas from a well within ten miles of an incorporated city ''without the heat therein contained being fully and actually applied and utilized for either manufacturing or domestic purposes'' to be a ''wasteful and extravagant use'' and unlawful, was held valid and constitutional. The court reasserted the doctrine that ''a state may consider the relation of rights, and accommodate their coexistence, and, in the interest of the community, limit one that others may be enjoyed.'' It also says: ''The determining consideration is the power of the state over, and its regulation of, a property in which others besides the companies may have rights and in which the state has an interest to adjust and preserve, natural gas being one of the resources of the state. And in this consideration it is more important to consider not for what a particular owner uses the gas, but the proportion of his use to that of others, or, it may be, the prevention of use by others; . . . '' It is apparent from the quotations that the legislative power of the state may be exercised for the purpose of adjusting coexisting rights. They also tend to indicate that the state may restrict or regulate the production of oil or gas on the theory of the public's interest in their natural resources. Whether this latter may be done we think is unnecessary to a decision of the present application. But as indicating that there is grave doubt concerning this power we here make reference to the case of *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229 [35 L. R. A. (N. S.) 1193, 55 L. Ed. 716, 31 Sup. Ct. Rep. 564]. The

state of Oklahoma attempted to prohibit the construction of pipe-lines for natural gas or the transportation of the same except by domestic corporations, the charters of which were to provide that it should only be transported between points in the state and not outside. The court in declaring the statute void said with reference to the power of the state to "preserve the common property" as distinguished from the right of the state to prevent waste: "The extent of power which the second question implies a state possesses challenges serious inquiry. The natural resources of a state may be other than natural gas; for example, may be timber and coal and iron and other metals; but it is contended that the right of conservation extends to these, and the broad statement of the first question" (the right of the state to preserve its resources) "is qualified in the argument by the properties of natural gas and the limitation of its supply. This, it is contended, gives a range to the police power of the state which otherwise it would not possess. And such power, as we understand the further contention to be, may determine not only the conservation of the resources of the state but as to what class of persons may use them, as dependent upon their transportation in state, rather than in interstate commerce. . . . The statute of Indiana" (considered in *Ohio Oil Co.* v. *Indiana, supra*) "was directed against waste of the gas, and was sustained because it protected the use of all the surface owners against the waste of any. The statute was one of *true conservation securing the rights of property, not impairing them.* Its purpose was to secure to the common owners of the gas a proportionate acquisition of it—a reduction to possession and property—not to take away any right of use or disposition after it had thus become property. It was sustained because such was its purpose; and we said that the surface owners of the soil, owners of the gas as well, *could not be deprived of the right to reduce it to possession without the taking of private property.* It surely cannot need argument to show that if they could not be deprived of the right to reduce the gas to possession, they could not be deprived of any right which attached to it when in possession. The Oklahoma statute far transcends the Indiana statute. It does what this court took pains to show that the Indiana statute did not do. It does not protect the rights of all surface owners against the abuses of

any. *It does not alone regulate* the right of the reduction to possession of the gas, but, *when the right is exercised,* when the gas becomes property, takes from it the attributes of property—the right to dispose of it; indeed, selects its market, to reserve it for future purchasers and use within the state, *on the ground that the welfare of the state will thereby be subserved. The results of the contention repel its acceptance. Gas, when reduced to possession, is a commodity; it belongs to the owner of the land; and, when reduced to possession, is his individual property, subject to sale by him, and may be subject to intrastate commerce and interstate commerce.* The statute of Oklahoma recognizes it to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. In other words, the purpose of its conservation is in a sense commercial—the business welfare of the state, as coal might be, or timber. Both of those products may be limited in amount, and the same consideration of the public welfare which would confine gas to the use of the inhabitants of a state would confine them to the inhabitants of the state. If the states have such power, a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining states their minerals. And why may not the products of the field be brought within the principle? Thus enlarged, or without that enlargement, its influence on interstate commerce need not be pointed out. To what consequences does such power tend? If one state has it, all states have it; embargo may be retaliated by embargo, and commerce will be halted at state lines. And yet we have said that 'in matters of foreign and interstate commerce there are no state lines'. In such commerce, instead of the states, a new power appears and a new welfare—a welfare which transcends that of any state. But rather let us say it is constituted of the welfare of all of the states, and that of each state is made the greater by a division of its resources, natural and created, with every other state, and those of every other state with it. This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there is to be a turning backward, it must be done by the authority of another instrumentality than a court.'' (Italics ours.)

It is argued, however, that the statute involved herein does not proceed upon the theory of correlative rights, but only upon the policy of conserving or preserving the common supply. We cannot assent to this statement or construction of the enactment. It is true that section 8b of the act declares the ''unreasonable waste of natural gas . . . to be opposed to the public interest'' and ''to be unlawful'', but it is also apparent from a reading of the entire act that unreasonable waste of gas is considered to be the production of an undue proportion of gas to the amount of oil, in the particular field involved, by one surface owner as against others, in those instances where the gas is not conveniently necessary for the ''generation of light, heat, power or other industrial purpose''. That this is the intent and purpose of the law is made manifest from the following quotation from section 8d: ''If it shall appear that gas is being produced from any oil well or wells in quantities exceeding *a reasonable proportion to the amount of oil produced* from the same well or wells, even though it is shown that such excess gas is being used in the generation of light, heat, power or other industrial purpose and that there is sufficient other gas available for such uses from other wells in the same or other fields in which the gas produced is not in excess of the amount which bears *a reasonable proportion to the amount of oil produced* from such other wells and that there are adequate gas-pipe-line connections between such other wells and the place of utilization of such gas the state oil and gas supervisor shall hold that such excess production of gas is unreasonable waste thereof if such holding will not cause an unreasonable waste of gas in any other field.'' (Italics ours.) The legislation was evidently adopted upon the theory that in every oil-field there is what we may term (at least for illustrative purposes) a normal proportion of gas to oil; that when an unreasonable disproportion of gas to oil exists in a given well there is a corresponding loss of recoverable oil by other owners who would otherwise employ the lifting power of the excessive gas to good purpose; and that this disproportionate production of gas should not be permitted unless the gas as a separate thing be conveniently necessary for domestic or industrial purposes. We have not overlooked the fact that the act makes the blowing or release of gas

into the air *prima facie* proof of unreasonable waste. It is to be observed, however, that such waste is not absolutely prohibited as it was in *Ohio Oil Co.* v. *Indiana, supra,* but is only made a rule of evidence. But even if such were the results of the act the authorities from which we have quoted would dispose of the arguments of the petitioners. We are, therefore, irresistibly led to conclude that the statute here involved is not as stringent in its restrictions as those in other jurisdictions, and further, that it does not deprive the petitioners of property without just compensation or due process of law but rather falls within the legislative authority of the state with the wisdom of which we cannot be concerned.

We also find authority of a persuasive character in our own state. In *Ex parte Elam,* 6 Cal. App. 233 [91 Pac. 811], the court was considering a statute to prevent the waste and flow of artesian wells and making it a misdemeanor to waste the flow thereof. On account of the pertinency of the discussion relative to a similar argument we deem it expedient to set forth in full the first question raised therein and the response of the court thereto. We quote as follows:

"The first point made by petitioner—which is that the act is violative of the fourteenth amendment of the Constitution of the United States, which provides that no state shall 'deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law', and of article I, section 1 of the Constitution of this state, which provides that 'all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property', and of section 13, article I, which provides that no person shall be 'deprived of life, liberty, or property without due process of law'—seems to have been met and demonstrated to be untenable by the Supreme Court of the United States in the case of *Ohio Oil Co.* v. *State of Indiana,* 177 U. S. 190 [44 L. Ed. 729, 20 Sup. Ct. Rep. 576]. By that case it is established that water, oil, gas, and all fugitive substances held in their natural subterranean reservoirs are exceptions to the general rule establishing absolute ownership in the proprietor of the surface

of all that lies underneath; that these minerals being migratory in their nature, having no fixed situs, are a part of the soil only so long as they are on or in it, but after they escape and go to other lands the title of the former owner is gone; that it follows, therefore, that no one owner of the surface of the earth within the area beneath which these minerals move can exercise his right to extract from the common reservoir in which the supply is held without diminishing the source of supply as to which all other owners of the surface must exercise their rights; that in consequence of the nature of the deposits, of their transmissibility, of their interdependence, of the rights of all and of the public at large, the state could lawfully exercise the power to regulate the right of the surface owners among themselves to seek to obtain possession, and to prevent the waste of the products in which all the surface owners within the area wherein they were deposited, as well as the public, had an interest. 'No devesting of private property under such a condition can be conceived, because the public are the owners, and the enacting by the state of a law as to the public ownership is but the discharge of the governmental trust resting in the state as to property of that character.' This water, the ownership of which, until actual possession is acquired, being in the public, or at least that portion of the public who may own the surface of the soil within the artesian belt, is subject to a reasonable use only by those interested therein. This reasonable use is determined in *Katz* v. *Walkinshaw*, 141 Cal. 134 [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], to be the use of such amount of the subterranean water 'as may be necessary for some useful purpose in connection with the land from which it is taken'. The conditions existing in this state with reference to the necessity for the conservation of irrigating waters are most clearly set out in the case last cited, and the reasons for the rule restricting the use clearly shown. Whenever a land owner exceeds this reasonable use he is appropriating to himself that which belongs to others who are entitled to a like use, and to that extent is obstructing the free use of property so as to interfere with its comfortable enjoyment, and which, by sections 3479 and 3480, Civil Code, is declared to be a public nuisance. Whatever right one has, even in his own, is sub-

ject to that established principle that his use shall not be injurious to the rights of others, *or of the general public.* This act, therefore, relates to waters, the right to the use of which is common to a large portion of the community, and affects the general public right. Legislation in relation thereto affects the public welfare, and the right to legislate in regard to its use and conservation is referable to the police power of the state, which is declared in *Ex parte Whitwell,* 98 Cal. 78 [35 Am. St. Rep. 152, 19 L. R. A. 727, 32 Pac. 870], to be 'the power to make laws to secure the comfort, convenience, peace and health of the community'. 'The police power, deriving its existence from the rule that the safety of the people is the supreme law, justifies legislation upon matters pertaining to the public welfare, the public health, or the public morals.' (*Ex parte Drexel,* 147 Cal. 766 [3 Ann. Cas. 878, 2 L. R. A. (N. S.) 588, 82 Pac. 429].) It is settled law that all property is held subject to the exercise of police power, and that provisions of the Constitution declaring that property shall not be taken without due process of law have no application in such cases. (*Odd Fellows' Cem. Assn.* v. *San Francisco,* 140 Cal. 230 [73 Pac. 987].)'' (Italics ours.)

It is to be observed that the case of *Ohio Oil Co.* v. *Indiana, supra,* is approved and legislation of a character very much akin to the enactment now under scrutiny has been found not to invade the constitutional provisions against deprivation of property without compensation and without due process of law.

In the discussion of the problem to this point we think the essential difference from the question involved in *Herminghaus* v. *Southern Cal. Edison Co.,* 200 Cal. 81 [252 Pac. 607], is made apparent. It is to be noted that the contest in that case was between a riparian owner, whose rights have long been established in our jurisdiction, and an appropriator of water who cannot divest a private existing right by his act of appropriation. This is quite a different thing from the adjustment and regulation of the coexisting rights of several persons. The rights here involved are more nearly analogous to those discussed in *Ex parte Elam, supra,* and in *Eckel* v. *Springfield Tunnel etc. Co.,* 87 Cal. App. 617 [262 Pac. 425], in the latter of which cases the rule was reannounced that as between riparian owners one can

only take his reasonable share thereof. It is there determined that he cannot take all that is reasonably required to develop his land, but only that amount that will not unreasonably deprive the owners of coequal rights of a proper proportion.

We therefore turn to the second angle of our problem: Is the statute void for uncertainty and the failure of the legislature to define a standard of conduct? The objection thus urged against the enactment arises from the use of the word "unreasonable". Were it not for the argument that it is not waste to permit the use of the gas to lift the oil to the surface it would be obvious that without the qualifying word the enactment could not be subjected to attack on the ground of uncertainty. As we have heretofore observed, the Indiana statutes prohibited all waste, and the United States Supreme Court concluded it to be a proper exercise of the legislative authority despite the argument that the owners of the surface were entitled to make use of its force to raise the oil from beneath the ground. Undoubtedly the legislature had in mind the Indiana statute and its construction, as well as others from other oil producing states. It would seem to logically follow that they made use of the word "unreasonable" for the very purpose of providing that the operators of a well might utilize a reasonable proportion of gas for the purpose of lifting the oil to the surface. This thought coincides with that indicated by the language we have already quoted to the effect that it shall be held to be an unreasonable waste of gas for one to produce gas in excess of "a reasonable proportion to the amount of oil produced", when such gas is not conveniently necessary for other than lifting purposes. When viewed in this light we think the word "unreasonable" is not so uncertain as to render the enactment void and inoperative. In fact, our courts have frequently applied the rule of reasonable use between riparian owners where similar correlative rights are involved. We have already cited the case of *Eckel* v. *Springfield Tunnel etc. Co., supra,* and *Ex parte Elam, supra,* and to these we may add the following: *Fall River Valley Irr. Dist.* v. *Mt. Shasta P. Corp.,* 202 Cal. 56 [56 A. L. R. 264, 259 Pac. 444]; *Turner* v. *James Canal Co.,* 155 Cal. 82 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520]. In the latter of these two cases

the words are so pertinent that they should be quoted. They are: "Out of regard to the equal rights of others whose lands may abut upon the same water the law has declared, as will hereafter be more fully shown, that the use of the water for irrigation, so far as it affects the rights of others similarly situated, *must be reasonable,* and must be confined to a reasonable share thereof. But with this common limitation, the right to use water upon adjoining land applies as well to the water of a lake, pond, slough or any natural body of water, by whatever name it may be called, as to a running stream." (Italics ours.) In a slightly different situation, but for the purpose of adjusting coequal rights, the Supreme Court applied the same doctrine in *Katz* v. *Walkinshaw,* 141 Cal. 128 [99 Am. St. Rep. 35, 64 L. R. A. 236, 74 Pac. 766], and *San Bernardino* v. *Riverside,* 186 Cal. 25 [198 Pac. 784]. In the former it said: "The doctrine of *reasonable use,* on the other hand, affords some measure of protection to property now existing, and greater justification for the attempt to make new developments. It limits the right of others to such amount of water as may be necessary for some useful purpose in connection with the land from which it is taken. . . . The objection that this rule of correlative rights will throw upon the court a duty impossible of performance, that of apportioning an insufficient supply of water among a large number of users, is largely conjectural." In the latter we find these words: "With regard to such land owners these cases hold that each owner of land overlying the same general underground supply of water may take such water on his own land for any beneficial use thereon, so long as such taking works no *unreasonable injury to other land overlying such waters;* that if the natural supply is not sufficient for all such owners, each is entitled only to his *reasonable* proportion of the whole, and that each may apply to the courts to restrain an injurious and unreasonable taking by another and to have the respective rights adjudicated and the use regulated so as to prevent unnecessary injury and restrict each to his reasonable share." (Italics ours.)

These authorities set at rest the contention that the enactment is uncertain as well as the incidental assertion that the legislature has by the language of the act and its failure to define a standard of conduct with greater rigidity,

attempted to confer upon the court a legislative function. From them, as well as those cases such as *Standard Oil Co. v. United States,* 221 U. S. 1 [Ann. Cas. 1912D, 734, 34 L. R. A. (N. S.) 834, 55 L. Ed. 619, 31 Sup. Ct. Rep. 502], wherein the court announced and adopted the "rule of reason" holding that it was only those unreasonable restraints of trade which were intended to be curbed by the Sherman Anti-Trust Act, we find that the courts have for a considerable period of time been accustomed in *circumstances such as are concerned in the present enactment to apply the standard and guide of reason for the adjustment of those rights the unrestricted exercise of which would injuriously affect the rights of others.* In fact, it is not a new rule in the domain of jurisprudence but a new adaptation of the old maxim: *"Sic utere tuo ut alienum non laedas."* (Italics ours.)

Sufficient has been said to effectually dispose of the remaining argument of the petitioners and demonstrate that it is founded on a misconception of the legislative intent. Their argument is in effect that they are not producing an undue proportion of gas when the gas production is measured by the oil from one specific well. But this is obviously not the purpose of the law, as may clearly be indicated by a single illustration. Suppose a well is drilled and comes in, as what is commonly termed "a gasser", that is, a well which produces an insignificant quantity of oil. Conceivably such a well might drain the field of its supply of gas, leaving the oil therein unrecoverable, to the great and irreparable injury of the other surface owners. We have instanced an extreme possibility, but our interpretation of the act is that it was intended to remedy a lesser, but nevertheless unreasonable, degree of waste of the same character.

Another answer to this argument of petitioners is that having determined that the court has the jurisdiction to determine what is an unreasonable waste, we cannot interfere by the writ of prohibition to deprive its judgment of effect. And we here direct attention to the determination of the respondent court that "there appears to be an unreasonable waste of natural gas in the Santa Fe Oil Field", and "that the evidence available . . . shows that the unreasonable waste of natural gas in the said field may be

substantially reduced and that the equities of all parties may be fairly conserved by a preliminary injunction which will limit the waste of gas by restricting the production thereof to a quantity reasonably in excess of the present outlets for beneficial use above ground, etc., etc." It does not appear from the facts presented to us that in so far as the particular case before us is concerned the court exceeded its jurisdiction in finding as we have already quoted.

It is suggested in the briefs that the legislature is without authority to restrict the production of oil, and lest we be misunderstood we deem it expedient to add that the record does not indicate that the temporary injunction was founded upon such a theory. Nor are we determining that the act attempts to confer upon the court any such power. Rather we are convinced that a proper construction of the enactment confines the authority within the limits of enjoining the production of gas when in excess of the reasonable proportion to the oil for the particular field involved, when not conveniently necessary for other than lifting purposes.

Writ of prohibition denied.

Works, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 27, 1930, and an application by petitioners to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 26, 1931.