[L. A. No. 20383.   In Bank.   Feb. 1, 1949.]

CHARLES C. LOCKARD et al., Respondents, v. CITY OF LOS ANGELES, Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones and Roger Arnebergh, Assistant City Attorneys, and Thos. H. Hearn, Deputy City Attorney, for Appellant.

Albert H. Allen and Hyman Goldman for Respondents.

GIBSON, C. J.—This is an appeal by the city of Los Angeles from a judgment declaring certain provisions of a comprehensive zoning ordinance invalid and void insofar as it affects the use of a strip of property twelve blocks long within which plaintiffs' property is situated.

The zoning scheme of defendant city adopted in June, 1946, classifies the city into 16 types of districts as follows: Two agricultural districts; one suburban district; five residential districts, zoned R-1 through R-5 starting with the

most highly restricted one-family residential areas through various grades of multiple dwellings; four commercial districts, zoned C-1 through C-4, in which are permitted various types of commercial uses; one business district, zoned C-M; and three industrial and manufacturing districts, zoned M-1 through M-3, where light and heavy manufacturing is permitted.

In areas zoned C-2, in one of which plaintiffs' properties were placed, all uses are permitted which are allowed in the more restricted residential and C-1 zones. It is also permissible in C-2 areas to carry on retail businesses including processing and manufacturing clearly incidental to a retail store, provided there are no more than five persons engaged in processing or manufacturing, and service enterprises such as catering, cleaning, laundering, plumbing, upholstering, and the like, provided no more than five persons are engaged in that work. In an M-1 zone the ordinance permits all uses allowed in more restricted zones together with practically all types of light manufacturing, fabricating, and processing, including candy making, soap manufacturing, light sheet metal fabricating, auto assembling, painting and repairing, blacksmithing, battery manufacturing, casting of lightweight nonferrous metals, and the like. Under the zoning scheme two zones less restricted than a C-2 zone intervene between C-2 and M-1: one permits the same uses as C-2, but allows taller buildings, and the other does not have the five-man limitation on fabrication incidental to retail business and allows the type of light manufacturing permitted in an M-1 zone, provided not more than 10 per cent of the floor space is devoted to it.

This suit involves the zoning of property fronting on Jefferson Boulevard, a through street running in an easterly and westerly direction. Both sides of Jefferson were zoned for C-2 uses for a distance of several miles east of Vineyard Avenue. Plaintiffs' properties consist of various noncontiguous parcels located on Jefferson in the twelve blocks lying between Vineyard Avenue on the west and Crenshaw Boulevard on the east. This 12-block strip is approximately 125 feet deep on each side of Jefferson and is bordered by alleys. The property to the south of the strip was placed mainly in an R-1 zone, with some R-2 and R-3 uses permitted, and north of the strip about one-half of the property was zoned R-1, the remainder being R-2 and R-3.

West of Vineyard for about six blocks both sides of Jefferson were zoned M-1. This district was bordered on the south

by a railroad track running diagonally southeast so that the total area zoned M-1 on the south side of Jefferson includes a triangular section deeper than 125 feet. South of the M-1 zone the property is principally zoned R-4, and most of it is not available for development for private uses because it is publicly owned and occupied for school and playground purposes. To the north of the section of Jefferson zoned M-1, the property was zoned mainly for two-family and multiple dwellings (R-2, R-3, R-4, and R-5). The only ways across the railroad track are at Crenshaw on the east, at Farmdale Avenue two blocks east of Vineyard, and at La Brea Avenue four blocks west of Vineyard in the M-1 zone.

The trial court viewed the area, and the parties stipulated concerning the uses made of the properties and the efforts of plaintiffs to have the 12-block strip rezoned. The stipulation shows that prior to June 1, 1946, under the former zoning scheme, the 12-block strip in which plaintiffs' properties are located was in a zone denominated "C-3," which was apparently comparable to the present C-2 zone in the uses permitted. This controversy began in November, 1944, when 13 property owners in this strip were cited for violations of the former ordinance. In view of pending plans for comprehensive rezoning of the city, the prosecutions were held in abeyance until it was determined in which zone the strip would be placed under the new plan. Several hearings were held before the planning commission and the city council in which it was sought to have the strip placed in an M-1 zone, but ultimately it was placed in the present C-2 zone. Twenty owners or lessees of property within the strip then brought this action in July, 1946. It is not disputed that plaintiffs took all the necessary administrative steps to get the strip zoned M-1 and did not commence this action until their administrative remedies were exhausted. (See *Metcalf* v. *County of Los Angeles*, 24 Cal.2d 267 [148 P.2d 645].)

The 12-block strip was divided into approximately 60 lots on each side of the street with a total frontage of about 6,275 feet. Of the total frontage 2,725 feet or 52 lots were vacant, 1,835 feet or 36 lots were devoted to uses permitted in a C-2 zone, and 1,715 feet or 30 lots were being used for purposes permitted in an M-1, but not a C-2, zone. Nine other lots were being partially used for M-1 purposes. Of the frontage devoted to M-1 uses, however, 50 feet were lawfully used because of an established nonconforming use existing prior to the first zoning of the property, 455 feet were being used lawfully

under permitted variances, and many of the violations on the remaining 1,210 feet were commenced subsequent to 1943. The plaintiffs, 20 owners and lessees within the 12-block strip, were using their property in violation of the ordinance, and, although the precise date when such violations commenced does not appear, one started his business in 1940, another in 1944, three in 1945, two in 1946, and one in 1947.* Of the various parcels claimed to be used for purposes not permitted in a C-2 zone, at least 25 were not so used prior to 1940 and 20 not until 1944, and the testimony indicates that many originally conformed to the ordinance but became nonconforming by reason of wartime expansion. A number of the violations were continuances of uses permitted under temporary variances of limited duration which were granted by the city during the war. It was stipulated that between September 23, 1946, and February 26, 1947, the date of the commencement of the trial, there were 19 instances of new uses along the 12-block strip, of which nine represented new construction. Of these new developments 15 were uses permissible in a C-2 zone, and four were uses not permissible there but proper in an M-1 zone.

There was testimony that property in the strip zoned C-2 has a value of $30 per front foot, that property in the immediately contiguous area zoned M-1 has a value of $150 to $200 per front foot, and that sales of 50-foot lots in the 12-block strip had taken place at $1,500 whereas similar lots in the M-1 zone sold for over $6,000. One property owner in the strip in question testified that he was unable to lease his property for a ''commercial business'' and another testified that when his property was for rent he had no inquiries for ''commercial uses'' but only from ''light manufacturers.''

The zoning administrator for defendant city testified that a special intensive study was made of the 12-block strip because of the efforts of the property owners to have it reclassified as an industrial zone, and that it was decided that the best use of the property was for commercial purposes. He further testified that in his opinion the proper classification

---

*A number of the claimed violations, including some by parties not plaintiffs, consisted of open storage outside of buildings, and it may be that such use was not a violation in view of *Greenfield* v. *Bd. of City Plan. Commrs.*, 6 Cal.App.2d 515 [45 P.2d 219] holding that under the prior ordinance contractors in ''C'' zone could maintain an open storage yard for usual machinery and equipment. (See, also, city attorney's opinion of May 19, 1947 [after trial], holding such use permissible in C-2 zone.)

of the strip was C-2 because it constituted a "shoestring or ribbon area" running through a solidly developed residential section. He stated that to classify it as an industrial zone "undoubtedly would eventually result in blighting an extensive well developed residential section," and that, although at the present time the property could not all be supported for retail stores, there were many businesses allowed in the C-2 zone which were of a servicing nature to which it could be devoted in addition to the permitted residential uses. In his opinion, there would be a need in the future for a good many types of servicing businesses which could be established and successfully supported. Such development would take place because a large residential area to the south named Baldwin Hills was rapidly being built up, and it would have to look to Jefferson for its service type businesses in view of the development along Crenshaw of the type of retail establishment which does not mix with the service enterprises. He also stated that a service type business frequently draws trade from a far greater distance than the ordinary retail store or shop, and that the lack of a way across the railroad track to the service businesses would not affect them because those enterprises are usually handled by telephone. He further testified that the surrounding residential area was a district "where people went in to establish their homes to be free from industrial noise."

Plaintiffs' experts testified that the strip could not be developed for C-2 enterprises because access to the surrounding territory was limited by the railroad track and that all neighborhood trade went to the established commercial sections on Crenshaw and on Adams Boulevard approximately four blocks north of Jefferson. A former member of the planning commission testified that it was desirable that people live close to their places of work, and that development for industrial uses "would brighten the street for activity there, give better protection for the homes and unsightly lots that existed there so many years." He further testified that "areas are zoned for residences in order to provide for the comfort, safety, and health and welfare of the residential area embraced within the zones, and protect it from the intrusions and encroachments of any nature that would affect that." When asked if it was good zoning practice to permit commercial activities as the primary encroachment on a residential area and whether retail business was less detrimental than industrial to such an area, he replied, "Well, it is debatable . . .

and it is only in the newer areas that it is possible to preserve all those ideals of zoning that you speak of, and not in the older areas.''

There are numerous findings, some of which are in the nature of conclusions of law. The court found that the owners of the property in the 12-block strip are unable to lease the land for commercial purposes and that the value of the land in the strip for a commercial use is $30 per front foot, whereas its value for light industry is between $150 and $200 per front foot. It was also found that the 12-block strip is similar and identical to the adjacent area zoned M-1 and is suitable only for light manufacturing and that the use of the strip for such purposes has increased to the point where it is now, predominantly light industrial in nature. The court declared that the character and condition of the strip had so changed that it would be unfair and inequitable to refuse to permit the owners to use their property for light industries and that its use for M-1 purposes would not adversely affect, but would enhance, the health, morals, safety, and welfare of the people of the surrounding territory. It concluded that the city council had acted in an arbitrary and discriminatory manner in placing the strip in zone C-2 and that restriction to C-2 uses would amount to a confiscation of plaintiffs' property.

The trial court declared the ordinance invalid insofar as it restricted the property in the 12-block strip to C-2 uses, and the judgment restrained the city from interfering with the use of such properties for the limited light manufacturing purposes permitted in an M-1 zone.

■ It is well settled that a municipality may divide land into districts and prescribe regulations governing the uses permitted therein, and that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power. (*Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 337 [175 P.2d 542]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; see *Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213, 215 [93 P.2d 93].) ■ In enacting zoning ordinances, the municipality performs a legislative function, and every intendment is in favor of the validity of such ordinances. (*Jardine* v. *City of Pasadena,* 199 Cal. 64, 72-73 [248 P. 225, 48 A.L.R. 509].) It is presumed that the enactment as a whole is justified under the police power and adapted to promote the public health, safety, morals, and general welfare. (See *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542].)

■ The courts will, of course, inquire as to whether the scheme of classification and districting is arbitrary or unreasonable, but the decision of the zoning authorities as to matters of opinion and policy will not be set aside or disregarded by the courts unless the regulations have no reasonable relation to the public welfare or unless the physical facts show that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power. (See *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; *Reynolds* v. *Barrett,* 12 Cal.2d 244, 251 [83 P.2d 29]; *Jardine* v. *City of Pasadena,* 199 Cal. 64, 72-76 [248 P. 225, 48 A.L.R. 509]; *Zahn* v. *Board of Public Works,* 195 Cal. 497, 514 [234 P. 388].) ■ The wisdom of the prohibitions and restrictions is a matter for legislative determination, and even though a court may not agree with that determination, it will not substitute its judgment for that of the zoning authorities if there is any reasonable justification for their action. (*Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 93-94 [33 P.2d 672]; *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 338, 339 [175 P.2d 542]; see *Reynolds* v. *Barrett,* 12 Cal.2d 244, 249 [83 P.2d 29]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455].) In passing upon the validity of legislation it has been said that "the rule is well settled that the legislative determination that the facts exist which make the law necessary, must not be set aside or disregarded by the courts, unless the legislative decision is clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice." (*In re Miller,* 162 Cal. 687, 696 [124 P. 427]; see, also, *Jardine* v. *City of Pasadena,* 199 Cal. 64, 72 [248 P. 225, 48 A.L.R. 509].)

■ In considering the scope or nature of appellate review in a case of this type we must keep in mind the fact that the courts are examining the act of a coordinate branch of the government—the legislative—in a field in which it has paramount authority, and not reviewing the decision of a lower tribunal or of a fact-finding body. Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of

powers neither the trial nor appellate courts are authorized to "review" legislative determinations. The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations. As applied to the case at hand, the function of this court is to determine whether the record shows a reasonable basis for the action of the zoning authorities, and, if the reasonableness of the ordinance is fairly debatable, the legislative determination will not be disturbed. (*Acker* v. *Baldwin*, 18 Cal.2d 341, 344 [115 P.2d 455]; *Sunny Slope Water Co.* v. *City of Pasadena*, 1 Cal.2d 87, 94 [33 P.2d 672]; *Feraut* v. *City of Sacramento*, 204 Cal. 687, 696 [269 P. 537]; *Jardine* v. *City of Pasadena*, 199 Cal. 64, 72 [248 P. 225, 48 A.L.R. 509]; *Zahn* v. *Board of Public Works*, 274 U.S. 325, 326 [47 S.Ct. 594, 71 L.Ed. 1074]; see *Reynolds* v. *Barrett*, 12 Cal.2d 244, 249 [83 P.2d 29].)

The findings and conclusions of the trial court as to the reasonableness of a zoning ordinance are not binding on an appellate court if the record shows that the question is debatable and that there may be a difference of opinion on the subject. The appellate courts look beyond such determinations and consider in some detail the basic physical facts appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. (See *Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 338-339 [175 P.2d 542]; *Acker* v. *Baldwin*, 18 Cal.2d 341, 344 [115 P.2d 455]; *Hurst* v. *City of Burlingame*, 207 Cal. 134, 143 [277 P. 308]; *cf.*, *Matter of Throop*, 169 Cal. 93, 97-99 [145 P. 1029].) Similarly, findings which relate to matters of opinion and judgment, such as that property is "suitable only" for certain purposes, are not controlling. (*Skalko* v. *City of Sunnyvale*, 14 Cal.2d 213, 216 [93 P.2d 93]; see *Jardine* v. *City of Pasadena*, 199 Cal. 64, 75 [248 P. 225, 48 A.L.R. 509].) As we have seen, matters of this type lie within the discretion of the zoning authorities, and their action will be upheld if the question is fairly debatable.

A case directly in point is *Ulmer Park Realty Co.* v. *City of New York*, 270 App.Div. 1044 [63 N.Y.S.2d 143] [aff'd 297 N.Y. 788, 77 N.E.2d 797]. Plaintiff sought a declaration that its land could not practically be developed for residential use, but only for industrial purposes, and the trial court found

that the land could not reasonably and profitably be used in conformity with the zoning law. Although the record showed that plaintiff's property was "pocketed" by a highway and by industrial uses (see 57 N.Y.S.2d 713, 715), and plaintiff's expert witnesses testified that residential development would not be practicable financially, there was evidence that a hundred or more bungalows had been built on the property but had been destroyed by fire, and defendant's witnesses concluded that the property could be profitably put to residential use (see 77 N.E.2d 797, 798). The judgment was reversed by the appellate division, which stated that where "the suitability of plaintiff's property for residential use presents a debatable question, the court may not substitute its judgment for that of the local legislative body." (63 N.Y.S.2d at p. 144. See, also, *Kraft* v. *Village of Hastings-On-Hudson,* 258 App.Div. 1060 [17 N.Y.S.2d 630]; aff'd 285 N.Y. 639 [33 N.E.2d 558]; *Franklin* v. *Incorporated Village of Floral Park* (App.Div.), 53 N.Y.S.2d 537, aff'd 294 N.Y. 862 [62 N.E.2d 488]; *Edge* v. *City of Bellaire* (Tex.Civ.App.), 200 S.W.2d 224, 227; *City of University City* v. *Hoblitzelle* (Tex.Civ.App.), 150 S.W.2d 169, 171.)

It appears from the record in the present case that there are undisputed physical facts which support the action of the planning commission and the city council in refusing to extend the boundaries of the M-1 zone. The maps introduced in evidence show clearly and graphically that both the industrial and commercial zones are small in comparison with the surrounding residential areas; that the industrial zone is located at one end of a long narrow strip zoned for light commercial uses designed to serve the residential areas; and that the present industrial area is bordered by a railroad which does not extend along the commercial zone but runs diagonally away from it. Also, most of the property south of the M-1 zone is publicly owned and occupied for school and playground purposes and is not available for private use, whereas all the property surrounding the C-2 strip is residential in character and fairly well developed. The legislative body was entitled to consider the fact that any extension of the industrial zone would not only tend to impose added burdens on the surrounding residential areas and create undesirable conditions such as noise, smoke, and heavier traffic, but might tend to displace the existing commercial uses and to force those uses, in turn, to encroach upon the residential areas.

464

The problem thus presented to the planning commission and city council was essentially that of determining where to draw the lines of demarcation. Plaintiffs here are not merely seeking to obtain reclassification of a number of scattered parcels, but rather are attempting to increase the M-1 area to encompass an entire additional 12-block district, including both their own properties and the properties of many persons not made parties to the action. Whether an industrial area should be so increased in size, and whether certain types of business uses may be permitted in sections immediately adjacent to residential areas, while manufacturing and industrial or other uses are prohibited, is primarily a matter of legislative concern and involves determinations not only of facts with respect to existing conditions in an area, but also of policy and opinion as to its future development. (See *Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 93 [33 P.2d 672].) Accordingly, in the present case, whether the 12-block strip was suitable for commercial uses or only for light industrial purposes, whether its development would be unduly hampered by the regulations, and whether the welfare of the surrounding residential areas would be enhanced by those regulations were all questions addressed to the legislative authorities, and their decision cannot be disturbed if the matters are fairly debatable.

■ It is asserted that the restriction in the C-2 zone to five employees engaged in manufacturing is an unfair discrimination between a successful business and one which is not successful. It is obvious, however, that the surrounding area will be much less affected by a small business than by a large one and that the number of persons employed in a manufacturing concern is indicative of the amount of the deleterious effects to be expected from such an enterprise. The placement of types of businesses within a city under a comprehensive zoning plan based on the number of employees is similar to the establishment of separate zones for single and multiple dwellings or the confinement of particular types of business to certain zones, and what is said with reference to properties situated on the boundaries of such zones is applicable here. ''Somewhere the line of demarcation must be drawn, and it is primarily the province of the municipal body to which the zoning function is committed to draw that line of demarcation, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested in the absence of a clear showing of an

abuse of that discretion." (*Miller* v. *Board of Public Works*, 195 Cal. 477, 495 [234 P. 381, 38 A.L.R. 1479] ; *Brown* v. *City of Los Angeles*, 183 Cal. 783, 789 [192 P. 716].) Wherever the dividing line is drawn between small and large businesses, those on one side of the line in the nature of things are not very different from those on the other, and we cannot say that it is unreasonable to make the line of demarcation depend upon the size of the enterprises involved as measured by the number of employees.

For the same reason the finding of the trial court that the area on Jefferson zoned M-1 is similar and identical to the area zoned C-2 is not controlling on the issue of the reasonableness of enacting the ordinance. It is well established that similar characteristics in adjacent and surrounding areas do not necessarily preclude the zoning authorities from placing adjoining territories in different zones or justify a court in substituting its judgment for the legislative decision. (See *Reynolds* v. *Barrett*, 12 Cal.2d 244, 249 [83 P.2d 29] ; *Feraut* v. *City of Sacramento*, 204 Cal. 687, 693 [269 P. 537] ; *Ex parte Hadacheck*, 165 Cal. 416, 422 [132 P. 584, L.R.A. 1916B 1248] ; *Brown* v. *City of Los Angeles*, 183 Cal. 783, 787 [192 P. 716].) Moreover, the two zones were not identical in that the record and the findings show that the surrounding areas are different. It is true that similar properties lie to the north of the two strips of property, although a more substantial portion of the land lying to the north of the C-2 strip was zoned solely for single family dwellings. The properties lying to the south, however, are decidedly different. The M-1 zone, being bordered by a railroad track, is more adaptable to industrial use, and almost all of the property immediately across the railroad track is devoted to public school and playground uses. On the other hand, the C-2 strip is not bordered by the railroad and, except for about three blocks (one zoned M-1 and two zoned C-2), all of the property to the south is residential in character. Most of it is zoned for single family dwellings, and a large portion of it is in use only for residential purposes.

Reliance is also placed upon the finding that the 12-block strip is now predominantly light industrial in nature, and it is contended that there has been such a change in conditions within the strip that the placing of the properties within the C-2 zone is unreasonable. The existence of nonconforming uses, however, does not necessarily invalidate a zoning

ordinance, and no vested right to violate an ordinance may be acquired by continued violations. (*Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 342, 344 [175 P.2d 542]; *Acker* v. *Baldwin*, 18 Cal.2d 341, 345-346 [115 P.2d 455].)

Moreover, it appears that the majority of the M-1 uses were carried on by plaintiffs in defiance of the zoning regulations, and they cannot take advantage of their own violations of the law. Of the total violations, some were commenced under wartime emergency variances which had expired or would terminate in the near future; others were started in the expectation that the attempts to have the 12-block strip rezoned as M-1 would be successful; and most of them were not used in violation of the ordinance prior to 1944. In these circumstances there is nothing which could be said to render it unreasonable to place the strip in zone C-2.

The only conflict in the evidence is to be found in the opinions of the witnesses as to future development of the property and as to the effect on surrounding territory of its use for various purposes. A commercial district of this type is necessarily limited as to expansion by the development of the surrounding area, and the fact that the district has developed slowly is not determinative of the reasonableness of the restrictions, since one of the bases for zoning regulations is the guidance of future development for the protection of residential areas. (See *Sunny Slope Water Co.* v. *City of Pasadena*, 1 Cal.2d 87, 93 [33 P.2d 672].) To be effective, zoning regulations must necessarily look to the future, and in determining what uses should be permitted in the 12-block strip, the legislative body was, of course, entitled to consider the effect of such uses on the surrounding areas, and to weigh the possibility of injury to those areas by reason of permitting various types of activity as against the desirability of allowing such uses. In view of the various factors involved and the testimony of the experts, it is clear that the propriety of restricting the 12-block strip to C-2 uses and its suitability for such uses were reasonably debatable, and it cannot be said that the regulations were unreasonable or arbitrary.

Plaintiffs also rely on evidence to the effect that property values for commercial uses in the 12-block strip were much less than those for light industrial purposes, that the property in the 12-block strip had not developed commercially, and that property in the strip could not be leased for commercial purposes but could be leased for industrial uses, and assert that the ordinance is oppressive. Exercises

of the police power, however, are apt to have an adverse effect on property interests, and the fact that some hardship is experienced or that it may be more profitable to make other use of the property is not controlling in determining whether the regulations are arbitrary or unreasonable. (*Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 338 [175 P.2d 542].) Before the ordinance may be held invalid on the ground of hardship it must be shown that there was such an abuse of discretion on the part of the zoning authorities as would justify the court in concluding as a matter of law that the ordinance is unduly oppressive and not reasonably necessary to promote the general welfare of the people of the community. (See *Miller* v. *Board of Public Works*, 195 Cal. 477, 484, 488 [234 P. 381, 38 A.L.R. 1479].) ██ The circumstances presented here do not show as a matter of law that this ordinance was not reasonably related to the interests of the community or that there was an unwarranted interference with property rights in zoning the 12-block strip. Moreover, the finding to the effect that the property in the strip could not be leased for commercial purposes is somewhat inconsistent with the stipulation of the parties, which shows that during the six months prior to trial there were 19 instances of new uses started in this 12-block strip, including nine cases of new construction, and that 15 of these uses were permissible in a C-2 zone.

*People* v. *Hawley*, 207 Cal. 395 [279 P. 136], *Pacific Palisades Assn.* v. *Huntington Beach*, 196 Cal. 211 [237 P. 538, 40 A.L.R. 782], and *In re Smith*, 143 Cal. 368 [77 P. 180], relied on by plaintiffs, are not controlling. All three cases involve regulations prohibiting special and exceptional uses of property, namely rock excavation, oil drilling, and gas manufacturing. In *Feraut* v. *City of Sacramento*, the Pacific Palisades case was distinguished on the ground that such cases refer "to some special and exceptional use to which property may be put, and they have but little application to the powers of municipal authorities to enact a general zoning ordinance." In addition, the Hawley and Pacific Palisades cases related to regulations prohibiting the recovery of natural resources from the earth. Such a business must operate, if at all, where the resources are found. Considerations which justify an exercise of the police power that necessarily results in putting a business out of existence are different from those which justify regulations that do not prevent the operation

of the business but merely restrict its location. Moreover, the Smith and Palisades cases are based in part upon the fact that the ordinances in question were enacted under the guise of regulation and segregation but were in fact to insure monopolies to similar enterprise in unrestricted districts. (See *In re Ellis,* 11 Cal.2d 571, 575 [81 P.2d 911].)

As we have seen, the problem presented to the zoning authorities in the present case was essentially that of determining where to draw the lines of demarcation between different zones. Various problems of wisdom and necessity are involved in such a determination, and, although there were a number of factors which, when considered together, might have justified an extension of the M-1 zone to embrace the 12-block area, there are undisputed physical facts in the record which support the action of the planning commission and the city council in placing the strip in a C-2 zone. It is, therefore, apparent that the reasonableness of the zoning ordinance was fairly debatable, and it cannot be held that the zoning authorities acted arbitrarily.

The judgment is reversed.

Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

This case presents the issue as to whether the findings of fact of a trial court on conflicting evidence may be ignored in determining on appeal whether a zoning ordinance is being unconstitutionally applied to plaintiffs' property. Concededly, whether or not the ordinance is so unreasonable or arbitrary as to be unconstitutional is a question of law, but the basic facts upon which the conclusion is based is one of fact for the appropriate tribunal. In the instant case, the majority opinion holds that this court will review and determine not only the law but also the facts. For illustration, it is said: "The appellate courts look beyond such determinations and consider in some detail the basic physical *facts* appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. . . . Similarly, findings which relate to *matters of opinion and judgment,* such as that property is 'suitable only' for certain purposes, *are not controlling.*" (Emphasis added.) Since when have the appellate courts of

this state become trial tribunals? If expert evidence as to the effect of the ordinance on plaintiffs' property is admissible at all, its weight and credibility is exclusively for the trial court. It may not believe the experts on one side but believe those on the other. The cases—*Skalko* v. *City of Sunnyvale,* 14 Cal. 2d 213 [93 P.2d 93], and *Jardine* v. *City of Pasadena,* 199 Cal. 64 [248 P. 225, 48 A.L.R. 509]—cited in the majority opinion, do not hold to the contrary. It is said in the Skalko case: ''The question, therefore, is whether under the facts shown by the appellant his rights are now being invaded by the existence and maintenance of the ordinance.'' The facts shown by the record are the findings of fact and we cannot go behind them if they are supported by any substantial evidence and we must review that evidence in the light most favorable to the prevailing party. In the Jardine case, the court held that certain evidence would not support the judgment because it was inherently incredible. Speaking generally and for illustration, it cannot be doubted that if the testimony showed that plaintiffs' property would be absolutely valueless if the zoning ordinance were applied to it and the court so found, the appellate court could not, without disregarding settled rules of law, reach any other conclusion than that the ordinance was unreasonable and arbitrary. The same would be true although there was also evidence to the contrary— that plaintiffs' property was fully usable and valuable for the purpose for which it was zoned if the ordinance was applied to it. For in such a case the trial court would have found the latter evidence not credible, false, or of no weight, in which event there would be nothing left but the first evidence. There would not even be an honest difference of opinion as to the effect the ordinance had on plaintiffs' property. Therefore, it could not be even reasonably debatable whether the legislative body had a basis for the ordinance. The United States Supreme Court considers the trial court as best suited to determine factual questions involved in constitutional law issues and will be guided by its findings. It will remand the case to the lower court to take evidence and make findings. (See *Chastleton Corp.* v. *Sinclair,* 264 U.S. 543 [44 S.Ct. 405, 68 L.Ed. 841] ; *Hammond* v. *Schappi Bus Line,* 275 U.S. 164 [48 S.Ct. 66, 72 L.Ed. 218] ; *Borden's Farm Products Co.* v. *Baldwin,* 293 U.S. 194 [55 S.Ct. 187, 79 L.Ed. 281] ; *Polk Co.* v. *Glover,* 305 U.S. 5 [59 S.Ct. 15, 83 L.Ed. 6] ; 49 Harv.L.Rev. 631; 38 Harv.L.Rev. 6 ; 21 Am. Bar Assn.J. 805.)

470

Turning to the findings in the instant case, it appears that "the uses of said land (where plaintiffs' land is located) for light industrial purposes has increased to the point where said use is now primarily and predominantly light industrial in nature.

"That although Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue has been zoned for commercial purposes for many years, little commercial usage has taken place on Jefferson Boulevard other than the usage for light industrial purposes. . . . That the property on Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue for commercial purposes *has a present land valuation of $30.00 per front foot*; whereas, said land for light industrial purposes has a valuation of *$150.00 to $200.00 per front foot*. That a 50-foot lot for commercial purposes as permitted by the Ordinances, has a valuation of $1500.00 per lot; whereas said lot for industrial purposes has a valuation of at least $7500.00 per 50-foot lot; . . . . That while the land on Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue has been zoned for commercial purposes, said land has remained vacant and *has had little or no development for commercial purposes*, whereas, similar and identical land immediately to the west of Vineyard Avenue has developed solidly for industrial purposes and at present there are only a few lots from Vineyard Avenue to LaBrea Avenue that are vacant, whereas the property east of Vineyard Avenue and zoned for commercial purposes has remained largely vacant. That the property on the south side of Jefferson Boulevard between Vineyard Avenue and LaBrea Avenue, while almost wholly vacant until the zoning of said property for light industrial uses in 1944, is now solidly developed for light industrial purposes, and there are only 2 vacant lots on Jefferson Boulevard between Vineyard and LaBrea Avenue, whereas in a comparable section of land east of Vineyard Avenue, there are few buildings and 50% of said land is vacant; that the owners of said property *have not been able to lease said property for commercial purposes*, whereas the owners of the same property have been able to use and lease said properties for light industrial purposes, . . . . that the restriction of the use of plaintiffs' property for light industrial purposes will amount to a confiscation of plaintiffs' property, which is *unsuitable for other than light industrial purposes.*

"That the use of plaintiffs' property, or other property owners who own property on Jefferson Boulevard between

Crenshaw Avenue and Vineyard Avenue, for light industrial purposes, would not interfere with the uses of adjoining property to the north or south of Jefferson Boulevard, nor would it in any way hinder or destroy any vested property rights of other property owners, and that by plaintiffs' using their property for light industrial purposes the surrounding and adjoining property would not be adversely affected. . . .'' (Emphasis added.)

Those findings are fully supported by the evidence. For example, Lockhard testified: ''Q. Would your business (plumbing) be able to continue, or could you continue your business from the retail trade you receive from the neighborhood? A. No.'' An expert testified without objection: ''Q. In your opinion, what is the best use that could be put to that property on Jefferson Boulevard, between Vineyard and Crenshaw? In your opinion, *could that property be profitably used for a C use?* A. I would say *it could not,* if I would be allowed to explain the answer. The property between Vineyard and Crenshaw could be used for some C uses, such as contractor's offices and things of that kind, but as a rule when a contractor gets a license for an office, which has always happened, he immediately has to have storage yard. It could be used for a filling station or two. It could be used for a few isolated uses but in general, *it could not be used for what we call general C (commercial) purposes.* One of the contributing factors of it is this, that the entire buying power of the neighborhood is shut off by public land, south of it by a railroad that has no crossing except at Farmdale. Another contributing factor is that Adams was an old street, and zoned for business; I think, therefore, if all the houses built in there which were originally merely single family residences were adjacent to Jefferson, take a few of them, there would not be enough purchasing power at all, because Adams Street originally had the original stores on it. Another contributing factor is that Crenshaw has been developed as a business street; take the corner of Crenshaw and south of that. North of that they are putting in a department store, the May Company, and other large stores on Crenshaw Boulevard south of this property. *The property does not have a chance, in my opinion, of becoming a C-2 Street.* It has no purchasing power. Q. You have had occasion to observe Jefferson Boulevard. In your opinion what has been the trend of development on Jefferson Boulevard west of Crenshaw? A. Industrial uses.'' And again: ''My summing up of this

property is this, as stated before, that Jefferson Boulevard is so situated in relation to Adams Street, and to already developed business on Crenshaw Boulevard, and to its being bound in by that railroad track, that, in my opinion, *it will never develop as a C-2 business,* except such uses as might be isolated cases which did not depend particularly upon that particular location for their income.'' Another expert (formerly director of the city department of planning) testified without objection: ''Q. As the director of the Department of Planning, in your opinion, was Jefferson Boulevard properly zoned for a C-2 zone? A. Was Jefferson Boulevard in this area for C? Q. Yes. A. I think not. . . . Q. In your opinion, could Jefferson Boulevard develop for *any* other purpose than light industrial use? A. *I think not.* . . . Q. What in your opinion would the effect be on the surrounding neighborhood, on the life of families and the welfare of the people in the surrounding neighborhood if Jefferson Boulevard from Crenshaw to Vineyard was zoned M-1? A. Well, there is a very little amount of frontage available there, and I think the uses that might be permitted under M-1 are quite restricted. It provides good employment for the district, and substantial homes, it would brighten the street for activity there, give better protection for the homes and unsightly lots that existed there so many years, it would have a very beneficial effect, particularly so in times of depression, that homes might be available close by. The type of home in that area is that predominantly of working class people, and they would find employment in the adjacent property. Q. You don't think it would be adverse? A. No, on the contrary, I think it would be very beneficial.'' (Emphasis added.)

The foregoing evidence fully sustains the finding of the trial court that to apply the ordinance to plaintiffs' property would render it practically worthless. That is the fact we must accept. Being such, how can it be said that the ordinance is not arbitrary and unreasonable as applied to it? To hold otherwise is tantamount to saying that the so-called legislative determination is conclusive and may not be reviewed by the courts regardless of the arbitrary and unreasonable character of such determination. If such is the law of this state, and the majority decision so indicates, the cases which hold that such determination is subject to review by the courts when it is attacked as arbitrary and unreasonable, should be overruled. (*In re Smith,* 143 Cal. 368 [77 P. 180] ; *Pacific Palisades Assn.* v. *Huntington Beach,* 196 Cal. 211 [237 P. 538, 40 A.L.R.

782] ; *People* v. *Hawley*, 207 Cal. 395 [279 P. 136] ; *Skalko* v. *City of Sunnyvale*, 14 Cal.2d 213 [93 P.2d 93] ; *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322] ; 12 Cal.Jur. 10-Yr. Supp. 164; 58 Am.Jur. 954.)

In essence, what the majority opinion holds is this: That the validity of such an ordinance depends upon whether four members of this court think it is reasonable as applied to plaintiffs' property, they being the judges of both fact and law. Such being the case, the function of the trial court is that of a mere referee to hear the evidence and make his recommendation which has no binding effect as a factual determination. This is indeed a new and unique legal philosophy of law without constitutional or statutory postulate.

In the case at bar the trial court after hearing the testimony of numerous witnesses, examining many maps, charts and diagrams, and the trial judge himself viewing the premises, made elaborate findings of fact to the effect that the application of the ordinance in question to plaintiffs' property would render it almost valueless. That court then concluded that the ordinance was unreasonable, and therefore, invalid and unenforceable as against plaintiffs' property. The case was then appealed to the District Court of Appeal, Second District, Division Two, and that court, in a well reasoned opinion prepared by Associate Justice McComb, and concurred in by all the members of that court, affirmed the judgment of the trial court. (85 A.C.A. 202 [192 P.2d 110].) Now, this court, by a bare majority, reverses the judgment, and, in effect, directs the entry of a judgment upholding the validity of the ordinance. In other words, four members of this court override the view of seven other judges, one of whom heard the witnesses testify and saw the property, and the other six are certainly in as favorable position to determine the reasonableness of the ordinance as the four justices who have joined in the majority opinion. When such a thing occurs, I am constrained to question the soundness of the oft-repeated adage that ''Ours is a government of law—not men.''

The basic concept in both the Constitution of the United States (Amendments V and XIV) and the Constitution of the State of California (sections 1 and 14 of article I) is that the ownership and occupancy of land are fundamental rights to be enjoyed by all citizens of the United States, and with the exception of the limited field in which the police power operates, these rights cannot be violated without compensation being paid to the owner. It is conceded that zoning of land

for particular uses comes within the purview of the police power. It must be likewise conceded that the exercise of this power must be reasonable, and that the determination of whether or not it is reasonable is for the court. Otherwise the rights guaranteed by the constitutional provisions above cited would not be protected. If a city council or a board of supervisors can adopt a zoning ordinance arbitrarily and unreasonably restricting the use to which real property may be put, and such an ordinance is not subject to review by the courts as to its reasonableness, then the value of all privately owned property is subject to the whim and caprice of these constantly changing political boards. One board of supervisors might zone all agricultural land in a certain area for farms of 10 acres each, or limit such farms to 10 cows or less, and the next board might see fit to increase or reduce the area and specify what can be raised on it. Likewise, the number of employees a farmer could hire would also be limited.

This would seem to follow in the face of the holding of the majority in the case at bar that property may be zoned for an industrial use which does not employ over five employees. There is obviously no limit, to which the use of property may be restricted by zoning under the holding of the majority in this case, and the property owner is without relief so far as the courts are concerned.

I do not consider the holding in the majority decision the announcement of a rule of law, but that it simply amounts to a dogmatic declaration that in the zoning field the will of the legislative body is supreme. This never has been, and never should be, the law of this state.

SHENK, J., and SCHAUER, J.—We agree with Justice Carter that, upon the record before us, established law requires affirmance of the judgment.

Respondents' petition for a rehearing was denied February 28, 1949. Shenk, J., Carter, J., and Schauer, J., voted for a rehearing.