[Civ. No. 17424. Second Dist., Div. Three. Oct. 17, 1950.]

HARRY K. SINDELL et al., Respondents, v. HUBER E. SMUTZ, as Zoning Administrator, etc., Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, and James A. Doherty, Deputy City Attorney, for Appellant.

D. A. Boone for Respondents.

VALLÉE, J.—Appeal by defendant from a judgment rendered in a proceeding seeking a writ of mandate commanding defendant, as zoning administrator of Los Angeles, to consider and pass upon petitioners' application to drill an oil well on their leasehold.

Petitioners, as lessees, are the owners of an oil lease covering several contiguous parcels comprising more than an acre in a city block of an area of 4.74 acres in what is referred to in the record as the "restricted area" of the Wilmington Oil Field.

The block, referred to as District 19, is located north of and adjacent to Highway 101 and near the west boundary of the field. Petitioners have the exclusive right to drill, and are obligated to drill, one well. District 19 is only partially improved. The west half is zoned for commercial uses. There are several business establishments, including a filling station, a restaurant and a garage. The remainder is largely unimproved. The southerly part along Highway 101 is zoned for commercial uses. The easterly half is improved with small residences. The block has fewer residences than most of the blocks to the south. Two oil wells have been drilled in District 19 and are now producing.

Under the initial general comprehensive zoning ordinance covering Wilmington Oil Field, adopted November 12, 1936, one well to an acre was permitted. In April, 1944, the city

block here involved was designated as an oil drilling district. (Ord. 88,392.) The block was later designated as District 19. In September, 1945, drilling in District 19 and certain other districts north of Highway 101 was restricted to one well in a city block. (Ord. 89,616.) A block had previously been defined, so far as pertinent, as "that property entirely surrounded by public streets." At that time one well had been drilled in District 19. *Bernstein* v. *Smutz*, 83 Cal.App.2d 108 [188 P.2d 48], was an attack on the validity of Ordinance 89,616. We held that, under the facts there alleged, Bernstein was entitled to a trial on the question of its validity as applied to District 19. After the trial a writ of mandate issued and the administrator authorized a second well in District 19, which was drilled but not on petitioners' leasehold. On November 19, 1948, Ordinance 94,136 was adopted, providing "that not more than two (2) wells may be drilled in each city block" in District 19 and some other districts north of Highway 101.

The Wilmington Oil Field is in the city of Los Angeles. It is sometimes referred to as the city of Wilmington. It comprises an area about 4-1/5 miles from east to west and 3-2/5 miles from north to south. The field extends throughout the city of Wilmington from the southeasterly boundary in a northwesterly direction to the extreme northwest section. The entire field overlies one oil pool. There is no obstruction to the free flow of oil from north to south throughout the field. Highway 101—Pacific Coast Highway—running in a general easterly-westerly direction, intersects the field about three miles from its south boundary. The discovery well was drilled in 1936 near the southeast boundary. The field is a low pressure one and there have been no serious fires or explosions occasioned by oil wells. Torrance Oil Field is immediately to the west of the Wilmington field.

Following discovery of oil, the Council of Los Angeles, by numerous ordinances pursuant to a general scheme and program of zoning, created oil districts through the industrial area, business section and residential section of Wilmington up to Highway 101. In all of these districts drilling for and production of oil was permitted on the basis of one well to an acre. Variances were liberally granted. The business section of Wilmington is a substantial one, and wells have been permitted on the basis of one well to an acre throughout that section in close proximity to various types of buildings, including hotels, banks and mercantile establishments. The resi-

dential area to the northwest, between the business section and Highway 101, is densely populated with many well-kept homes, schools and churches. Wells have been permitted, drilled, and are now producing throughout that area on the basis of one well to an acre. In a great majority of the city blocks there are three or more wells to a block, many of them in close proximity to residences, schools and churches.

The part of the field north of Highway 101 is referred to in the record as the "restricted area." This area comprises an extremely small section of the city of Wilmington. It is partially zoned for oil drilling, commercial and residential uses. The residences in this area are more modest and in many instances evidence less care than those to the south in which drilling has been permitted on the basis of one well to an acre.

A few blocks north of District 19, in county territory adjacent to the restricted area, there are producing wells, a tank farm and an oil refinery which are in operation. Immediately to the north of District 19 there are producing wells. Immediately to the west and adjacent to District 19 wells are producing on the basis of one well to an acre. Immediately to the south across Highway 101 wells are producing on the basis of several wells to one block, one of said blocks being within 400 feet of District 19. Immediately to the east, in District 36, wells are permitted on the basis of one well to an acre, and in two other blocks on the basis of more than two wells to the block. There is no difference in the character of District 36 and the two other blocks and that of District 19. Within six months prior to the judgment additional wells were drilled and producing immediately adjacent to District 19. The property surrounding District 19 is largely industrial in character. There are no noticeable odors or noises from wells drilled north of Highway 101. The areas of the blocks in the small restricted area vary from 1.52 to 16.16 acres. In many of the blocks south of Highway 101 in which wells have been drilled on the basis of one well to an acre the business and residential areas are of far greater value, more densely populated, and contain far more improvements than District 19.

The oil in the Wilmington field flows readily. There is drainage of oil from under petitioners' property by reason of wells in close proximity to District 19. There is drainage from north to south between the area north of Highway 101 and immediately east of Wilmington Boulevard and the area south of Highway 101 and east of Wilmington Boulevard. This

movement has been occurring since the wells immediately south of Highway 101 were drilled. The fact that there are three or four wells in a block south of Highway 101 causes a reduction of the pressure in that area and a movement of the oil several blocks to the north to that area. There have not been sufficient wells drilled north of Highway 101 to prevent drainage. Drainage will continue to the south from north of Highway 101 until the number of wells both north and south of that highway has been equalized. Drainage from under petitioners' property will continue until all recoverable oil has been drained therefrom or until such time as petitioners are permitted to drill a well upon their property and recover their share of the oil. Each day the drainage continues and petitioners are prohibited from recovering oil under their lease, they are suffering a loss of several hundred dollars. Over a period of time the commercial part of the oil under petitioners' lease will migrate to the various wells and the low pressure area to the south. There was evidence that the ultimate recovery that might be had from a well drilled at the present time on petitioners' lease is about 90,000 barrels of 19 gravity oil in 10 years.

The Municipal Code of Los Angeles makes provision for masking any unsightly condition that might exist by reason of producing wells and tanks. Pumping units and storage tanks must be submerged.

On December 1, 1948, petitioners applied to the zoning administrator for determination of the conditions and methods of operation for drilling of and production from an oil well on their leasehold in District 19. On December 14, 1948, the administrator notified petitioners that their petition was rejected because of Ordinance 94,136 and because more than two wells in the block was contrary to the policy of the zoning administrator. Petitioners appealed to the Board of Zoning Appeals. The appeal was dismissed.

The court found that:

No reasonable ground exists for limiting the small area north of Highway 101 ''to two wells per block and permitting unlimited drilling in all other portions of the city, as long as there is one acre to each well drilled.''

The ''drilling of a third well on petitioners' property . . . would create less interference and less hazard to public health, safety and welfare than wells to the south and east through

the heart of the city of Wilmington, permitted on the basis of one well to an acre.''

Ordinance 94,136 permits the creation of conditions contrary to its alleged purpose of safety and aesthetic considerations in that it allows the erection of four derricks and the drilling of four wells from the surface of each of two blocks which are adjacent to a high school in the area north of Highway 101.

The ordinance ''does not afford equal rights to all, but restricts or enlarges rights according to the area of each particular block which in turn affects drainage and income, according to the area of each particular block.''

Ordinance 94,136 deprives petitioners of rights coequal with the rights of adjacent owners and lessees to recover their fair share of oil from the common source of supply and deprives them ''of valuable property rights without any corresponding benefit to the public health, safety, morals and welfare, and infringes upon constitutional guaranties.'' The ordinance, applied to District 19, is discriminatory, arbitrary and confiscatory as against petitioners' rights ''and that of their lessors,'' without any gain to the public generally; does not apply uniformly to all property and property owners in the restricted area; creates a monopoly; and does not give petitioners equal protection of the law.

The ordinance is not required or necessary under the police power of Los Angeles and has no reasonable relation to the ends for which the police power exists to protect the public health, safety, morals and welfare.

The court adjudged that the Municipal Code of Los Angeles, as amended by Ordinance 94,136, and any rule, regulation or policy of the zoning administrator, insofar as they prevent petitioners from drilling a well on their leasehold, are unconstitutional. The judgment directed that a writ of mandate issue, commanding the zoning administrator to consider and pass upon petitioners' application to drill a well, and directing him to permit them to drill a well, without considering or applying such unconstitutional provisions, and to forthwith determine and prescribe conditions under which they may drill for and produce oil on their property.

The trial judge, on stipulation of the parties, viewed District 19 and all of the surrounding areas. The conditions he observed and the knowledge he gained constitute independent evidence which he had a right to consider in determining

the issues involved. (*Wheeler* v. *Gregg*, 90 Cal.App.2d 348, 366 [203 P.2d 37]; *Rowland* v. *Pomona*, 82 Cal.App.2d 622, 624, 625 [186 P.2d 447]; *Mitchell* v. *City of Santa Barbara*, 48 Cal.App.2d 568, 573 [120 P.2d 131].) Some of the knowledge gained and the conditions observed by the trial judge and other pertinent comments were stated by him at the close of the case. He said in part:

''The block immediately across the street to the south from our block is not restricted. The other blocks along Pacific Coast Highway and to the south thereof are not restricted. There are three wells operating within the block located about four hundred feet to the west of our block. There are three wells operating in each of the next four blocks immediately to the west [east] thereof. . . . Three or four wells in most of the blocks immediately south of the first tier of blocks south of Pacific Coast Highway. . . .

''The two-well per block restriction area is probably less than one per cent of the total area of Wilmington City which is devoted to the production of oil. . . .

''. . . the acreage, net acreage, of our block, District 19, is larger than twenty-eight of the others and smaller than only six of the others. So, it is true, . . . that insofar as acreage is concerned the ordinance does not attempt to give equal rights to all, but restricts such rights or enlarges them according to the area of each particular block. . . .

''It is hard for the Court to understand where there is any reasonable ground for limiting a small portion of a city to two-wells per block and permitting unlimited drilling in all other parts of the city, as long as there is one acre to each well drilled. The character of the neighborhood and surrounding houses gives less reason therefor than exists in many of the blocks to the south of Pacific Coast Highway.

''The number of houses in the block, that is, our block, gives no reason therefor, since they are fewer than in many of the blocks, if not in most of the blocks, to the southeast thereof. . . .''

The parties stipulated to the following persuasive facts: leases throughout the field call for not less than one well per acre; property owners and lessees in the area have received, and are now receiving, a share of the oil produced from three or more wells in some blocks and in many cases four wells; the field is a low pressure field and there have never been any serious fires or explosions occasioned by oil wells.

. *Bernstein* v. *Bush*, 29 Cal.2d 773 [177 P.2d 913], had to do with spacing regulations in the Wilmington Oil Field. (Pub. Resources Code, §§ 3600-3607.) The petitioners, owners of noncontiguous lots of less than an acre each, entered into a community lease with the petitioner Bernstein. The petitioners contended the spacing regulations were discriminatory and therefore unconstitutional. The court, in part, said, page 778: ''They assert that such discrimination results from the fact that the enforcement of the regulations permits some owners of lands overlying the oil basin to exercise and enjoy their property right to take oil from the field, while the petitioners, who are property owners overlying the same oil supply, are deprived of the use and enjoyment of their coequal right. The mere assertion of the problem suggests the answer.

''Under the law of this state the landowner has a property right in oil and gas beneath the surface, not in the nature of an absolute title to the oil and gas in place, but as an exclusive right to drill upon his property for these substances. His unqualified and absolute title attaches after the substances have been reduced to possession. (*Tanner* v. *Title Ins. & Trust Co.*, 20 Cal.2d 814, 819 [129 P.2d 383] ; *Bandini Petroleum Co.* v. *Superior Court, supra*, 110 Cal.App. 123, 127 [293 P. 899].) This is a right which is 'as much entitled to protection as the property itself, and the undue restriction of the use thereof is as much a taking ''for constitutional purposes as appropriating or destroying it.'' ' (*People* v. *Associated Oil Co., supra*, 211 Cal. [93] at pp. 99-100 [294 P. 717] and cases cited.)

''In *Ohio Oil Co.* v. *Indiana*, 177 U.S. 190, at 209 [20 S.Ct. 576, 44 L.Ed. 729], involving an oil and gas conservation measure, the Supreme Court said that all (not some) of the surface proprietors within an oil and gas field have the right to reduce to possession the oil and gas beneath the surface, and that they could not be absolutely deprived of that right without a taking of private property. The court went on to consider the owners' coequal right to take from the common source of supply, observing that one owner should not be permitted to convert an undue proportion of the supply to the detriment of others; hence that from the peculiar nature of the property right, the legislative power might be exerted in the protection of all the collective owners by securing a just distribution among them. Thus the Supreme Court held that a statute designed to protect life and property or prevent

waste, or both, must apply without discriminating against the coequal rights of the property owners; also that a police regulation otherwise reasonable which was designed to secure to each a just distribution from the common source of the supply of oil and gas, took proper cognizance of the property owners' rights. (See, also, *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Tex. 59 [131 S.W.2d 73].) In the latter case it was said that the denial to one surface owner of his fair chance to recover in kind the oil and gas beneath the surface, or its equivalent, would be a confiscation of his property.

"In *Railroad Commission* v. *Magnolia Petroleum Co.* (Court of Civil Appeals of Texas), 169 S.W.2d 253, the test of confiscation was said to be the denial to one of the property owners of the equal opportunity with adjoining leaseholders to develop and realize the benefits from his leasehold; and it was concluded that confiscation resulted from the commission's ruling which had not accorded to the Magnolia company an equal opportunity with the surrounding lessees to recover its fair share of the recoverable oil lying beneath the surface. To the same effect and with a similar result is *Marrs* v. *Railroad Commission*, 142 Tex. 293 [177 S.W.2d 941].) . . .

"In the absence of statutory prohibition, the right to drill an offset well was commonly resorted to as a means of protection by an owner whose property was being drained by a well drilled on adjoining land. The wasteful use of offset wells was recognized as one of the evils sought to be minimized by the enactment of well spacing regulations. (*Croxton* v. *State*, 186 Okla. 249 [97 P.2d 11, 19]; *Brown* v. *Humble Oil & Refining Co.*, 126 Tex. 296 [83 S.W.2d 935, 87 S.W.2d 1069].) But since the mere opportunity for voluntary pooling of interests does not afford equal protection within the meaning of the federal and state Constitutions, regulatory provisions which in effect prohibit the drilling of offset wells may amount to a denial of the equal protection of the law and a taking of private property without due process of law. Equal protection is so denied where, as here, the law, in its application at least, does not afford adequate means of protection as a substitute for the right to drill an offset well."

In *Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332 [175 P.2d 542], it was said that among the cases in which zoning ordinances have been held invalid were (1) cases where the ordinance attempts to exclude and prohibit existing and established uses or businesses that are not nuisances, and

(2) cases where the restrictions create a monopoly. The ordinance in the present case does both. For many years one well to an acre was permitted in the entire field. Hundreds of wells were drilled on that basis. A small outlying part of the field from which oil migrates to these many wells was then restricted to one well in a block. After we held in *Bernstein* v. *Smutz, supra,* 83 Cal.App.2d 108 (Dec. 1947), that, under the facts alleged, this restriction infringed upon constitutional guaranties, and after the facts alleged were proven on trial, Ordinance 94,136 was adopted to permit the drilling of two wells in a block in the small—less than 1 per cent—part of the field which for a short period had been restricted to one well in a block. This ordinance did not eliminate the unconstitutional features of the classification. Hundreds of wells still exist, one to an acre, in most blocks in the field. These and other wells are draining oil from below petitioners' property. The ordinance attempts to exclude and prohibit an existing use which is not a nuisance and grants a monopoly to owners and lessees in which there are, or in the future may be, more than two wells in a block.

Appellant says that a city block is a proper unit of land measure for zoning the small restricted area north of Highway 101 and that therefore the ordinance is not unreasonable. If, under the comprehensive zoning scheme originally adopted, the restriction had been one well in each block instead of one well in each acre, and if the blocks were all the same or nearly the same size, and if each owner were afforded the right coequal with the rights of other owners and lessees to recover his fair share of the oil from the common source of supply, the argument might have some force. Upon this record it has none.

Appellant argues that "the issues presented in the case at bar are far different from those involved in *Bernstein* v. *Smutz, supra,* 83 Cal.App.2d 108." The facts alleged in the Bernstein case differ from those in the case at bar only in this: In Bernstein, the ordinance limited drilling to one well in a block in a small part of the field; in the present case, the ordinance limits drilling to two wells in a block in the same small part of the field. All that we said in Bernstein, upon the assumption that the facts pleaded were true, applies with equal force here.

It is argued that because petitioners acquired their lease after District 19 had been restricted to one well in a block, their contentions cannot be sustained. Petitioners acquired

their lease about March 5, 1947. At that time District 19 was restricted to one well by Ordinance 89,616, which was subsequently held invalid as applied to that district. Appellant relies on *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Tex. 59 [131 S.W.2d 73], in which it was held that under a rule of the Railroad Commission, subdivisions of land as such which came into existence after an oil well spacing rule became effective, are not protected against confiscation. The case relied on is not analogous. In that case after a spacing rule had been adopted, a 6.88-acre tract was subdivided into six smaller tracts, one of which was the 2.35-acre tract involved in the lawsuit. A well was drilled on each of the six tracts. The owners of the 2.35-acre tract sought to drill a second well thereon. The spacing rule prohibited the drilling of the second well. Notwithstanding, the commission granted a permit to drill a second well to prevent confiscation of property. The court held that the commission was not warranted in granting the permit as, under the spacing rule, any right the 2.35-acre tract had must be relegated to the rights of the 6.88-acre tract because, under the evidence, when the 6.88-acre tract was considered as a unit no well was needed to prevent confiscation. In the course of the opinion it was said that the commission could not indulge in unreasonable discrimination between different tracts of land in the same field. (See, also, *Marrs* v. *Railroad Com.*, 142 Tex. 293 [177 S.W.2d 941, 949].) We have an entirely different situation here. When the block in question—District 19—is considered as a whole, at least another well is needed thereon to prevent discrimination and confiscation. The rule noted in the Gulf Land Company case does not obtain where, as here, the well is warranted as a protection to vested rights when applied to the entire tract as it existed before the subdivision. (*Humble Oil & Refining Co.* v. *Lasseter* (Tex.Civ.App.), 120 S.W.2d 541, 542 (error dismissed). Further, the ordinance is discriminatory as to petitioners' lessors. Since Ordinance 89,616 was invalid as applied to District 19, it cannot serve as an obstacle to the assertion by petitioners of their constitutional right.

Cases cited by appellant upholding, as constitutional, statutory regulations having to do with the location and spacing of wells, are not in point and need not be reviewed. In those cases the regulations provided equal treatment of the rights of the surface owners in the common source of supply, or contained provisions looking to the prevention of hardship upon

owners in particular cases. The ordinance in the present case does not do either.

■ · Under the facts, the ordinance in question does not "afford adequate means of protection as a substitute for the right to drill an offset well." It deprives petitioners of their right, coequal with the right of other owners and lessees in the Wilmington Oil Field, to recover their fair share of the oil from the common source of supply and, consequently, infringes upon the constitutional guaranties invoked. There is no equality of production. Considering the physical facts appearing in the record, the reasonableness of the ordinance is not fairly debatable nor do the facts show a case where there may be a difference of opinion on the subject. It is clear that the exercise of legislative power has exceeded constitutional limitations. The facts are such as to require this court to conclude, as a matter of law, that the ordinance is unduly oppressive and not reasonably necessary to promote the general welfare of the community.

The case is one "related to regulations prohibiting the recovery of natural resources from the earth. Such a business must operate, if at all, where the resources are found. Considerations which justify an exercise of the police power that necessarily results in putting a business out of existence are different from those which justify regulations that do not prevent the operation of the business but merely restrict its location. Moreover, the Smith [*In re Smith*, 143 Cal. 368 (77 P. 180)] and Palisades [*Pacific Palisades Assn.* v. *Huntington Beach*, 196 Cal. 211 (237 P. 538, 40 A.L.R. 782)] cases are based in part upon the fact that the ordinances in question were enacted under the guise of regulation and segregation but were in fact to insure monopolies to similar enterprise in unrestricted districts. (See *In re Ellis*, 11 Cal.2d 571, 575 [81 P.2d 911].)" (*Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 467 [202 P.2d 38, 7 A.L.R.2d 990].)

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 14, 1950. Traynor, J., voted for a hearing.